**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

)
)
**WILLIAM GRIFFIN,**                                  )
)
    **Plaintiff,**                                 )
)
    **v.**                                        )      **Civil Action No. 14-12668-DJC**
)
**ADAMS AND ASSOCIATES OF**                          )
**NEVADA, ADAMS AND**                                )
**ASSOCIATES, INC., SHRIVER JOB**                    )
**CORPS CENTER and JAMIE WILSON,**                   )
)
    **Defendants.**                                )
)
)
_____)


**MEMORANDUM AND ORDER**

**CASPER, J.**                                                            **June 28, 2016**

## I.    Introduction

Plaintiff William Griffin has filed this lawsuit against Defendants Adams and Associates of Nevada, Adams and Associates, Inc., Shriver Job Corps Center ("Shriver") and Jamie Wilson ("Wilson") (collectively, "Defendants") asserting discrimination, harassment and retaliation claims arising from Griffin's employment and termination at Shriver.  D. 11 at 10.  Griffin asserted claims for gender and sexual orientation discrimination, harassment and retaliation pursuant to Mass. Gen. L. c. 151B and 42 U.S.C. § 1983 against Adams and Associates of Nevada, Adams and Associates, Inc. and Shriver (Counts I, II, III, IV, V & VI) and Wilson

1

(Counts VII, VIII, IX, X, XI & XII).  D. 11 at 10-25.[1]  The Court previously granted the Defendants' motion to dismiss the Section 1983 claims in light of no opposition from Griffin.  D. 15.  Defendants have now moved for summary judgment on all remaining counts, those arising under Mass. Gen. L. c. 151B, against them.  D. 45.  For the reasons discussed below, the Court ALLOWS IN PART and DENIES IN PART the motion for summary judgment.

## II.   Standard of Review

The Court grants summary judgment where there is no genuine dispute regarding any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that "carries with it the potential to affect the outcome of the suit under the applicable law."  García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014) (quoting Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014)) (internal quotation mark omitted).  The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (citation omitted).  Once that burden is met, the non-moving party may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but, "with respect to each issue on which [he] would bear the burden of proof at trial," must "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor."  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citations omitted).  The Court views the record in the light most favorable to the non-moving party, "drawing reasonable inferences" in his favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted).  "Conclusory allegations, improbable inferences, and unsupported

---

[1] Although Griffin's Opposition references violations of Title VII, D. 52 at 22, 24, he did not bring claims under that title, D. 11 at 10-25 and his counsel conceded at the summary judgment hearing that these references were inadvertent, Hrg. Tr. at 14.

speculation," however, are "insufficient to establish a genuine dispute of fact." <u>Travers v. Flight Servs. & Sys., Inc.</u>, 737 F.3d 144, 146 (1st Cir. 2013) (citation and internal quotation mark omitted).

### III.    Factual Background

The following facts are drawn from the parties' statements of material facts, D. 47, D. 53, and, unless otherwise noted, are undisputed.

From November 2008 to his termination on or about May 21, 2013, Griffin was employed as an "Overnight Center Shift Manager" at Shriver in Devens, Massachusetts.  D. 47 ¶¶ 1-2; D. 53 ¶¶ 1-2.  At all relevant times, Shriver was owned and operated by Adams and Associates, Inc.  D. 47 ¶ 2; D. 53 ¶ 2.  On February 12, 2012, Wilson joined Shriver as Social Development Manager and served as Griffin's supervisor.  D. 47 ¶¶ 30, 90; D. 53 ¶¶ 30, 90.  It was at this time Griffin started noticing a pattern of Wilson's treatment towards him, making him feel uncomfortable.  D. 47 ¶ 31; D. 53 ¶ 31.  From February 2012 through April 2012, Wilson purportedly made certain discriminatory statements at or regarding Griffin, a gay man.  D. 47 ¶¶ 32-50; D. 53 ¶¶ 32-50 (disputing the Defendants' characterization of some of these comments).

On April 9, 2012, Griffin wrote a letter to Walter Carino ("Carino"), the human resources director at Shriver, D. 47 ¶ 138; D. 53 ¶ 138, describing some of the incidents, D. 47 ¶¶ 50, 53; D. 53 ¶¶ 50, 53.  In response, an investigation was launched and Carino called a meeting between Griffin and Wilson.  D. 47 ¶ 55; D. 53 ¶ 55.  Griffin and Wilson attended the meeting with Carino to mediate the matter.  <u>Id.</u>  Leon Parker, Griffin's other supervisor, and Jen O'Neal, Shriver's Deputy Director at the time, also joined the meeting.  <u>Id.</u>  At the meeting, Carino instructed Griffin and Wilson to treat each other with respect and they both agreed to be more sensitive to each other in conversation.  D. 47 ¶ 56; D. 47 ¶ 56.  At the request of Griffin, he and Carino had a follow-up meeting.  D. 47 ¶ 59; D. 53 ¶ 59.

About four months after the April 2012 meetings, Griffin received written discipline on August 18, 2012 for not being in the area to which he was assigned, but claims he also received verbal discipline for other matters.  Id. ¶¶ 63-65; D. 53 ¶¶ 63-65.  Shortly thereafter, on August 28, 2012, Griffin wrote a letter to Adams' management outlining the issues he was encountering at Shriver.  D. 47 ¶ 68; D. 53 ¶ 68.  Griffin felt that his treatment rose to the level of a valid gender and sexual orientation claim and thus the ability to file a claim with the "Massachusetts Commissioner [sic] Against Discrimination."  D. 47 ¶ 70; D. 53 ¶ 70.  Adams assigned Ross Peterson ("Peterson"), the Executive Director of New England Operations, to investigate Griffin's complaints.  D. 47 ¶ 76; D. 53 ¶ 76.  As a part of the investigation, Peterson met with Griffin and the individuals implicated by Griffin's complaints.  Id.  Following the investigation, Griffin met with Peterson, Carino, Barbra Smith, the property manager and EEO Officer at Shriver at the time, D. 53 ¶ 200, and Wilson to discuss the results of the investigation, D. 47 ¶ 79; D. 53 ¶ 79.  At that meeting, Peterson informed Griffin that Adams found no evidence of discrimination and closed Griffin's complaint.  D. 47 ¶ 80; D. 53 ¶ 80.  Following the meeting, Griffin alleges that Wilson was angry and that she stated to him that she was "protected" and will see that "everything that needs to happen to [him] happens to [him]."  D. 47 ¶ 83; D. 53 ¶ 83.  After the meeting, Griffin felt that the Defendants were not going to do anything to alleviate his situation and he began to seek other employment.  D. 47 ¶ 85; D. 53 ¶ 85.

Griffin alleges that on or about September 28, 2012, Wilson made purportedly discriminatory and graphic comments to him regarding his conduct in the bathroom and with other gay men.  D. 47 ¶ 91; D. 53 ¶ 91.  On October 22, 2012, Griffin went on FMLA leave and did not return until January 13, 2013.  D. 47 ¶ 86; D. 53 ¶ 86.  At some point before Griffin returned from FMLA leave, a restructuring took place and Wilson ceased being Griffin's

supervisor and became his peer.  D. 47 ¶ 90; D. 53 ¶ 90.  Griffin alleges that once he returned from leave, he found a photograph of him and his boyfriend damaged and in the trash.  D. 47 ¶ 94; D. 53 ¶ 94.

The parties dispute whether Griffin was having job performance issues in February 2013. D. 47 ¶ 95; D. 53 ¶ 95.  It is undisputed, however, that on March 4, 2013, Adams evaluated Griffin's performance as "Below Acceptable Standards"—the parties dispute the issues identified in the review—and on March 11, 2013, placed him on a ninety-day Corrective Action Plan ("CAP"), which identified certain areas for improvement.  D. 47 ¶¶ 96, 98, 101, 104.  The plan indicated that if "Performance Progress does not occur, or if performance in other required areas outside those specified in the CAP falls below the required levels, you may be considered for termination prior to the completion of the 90-day CAP period."  Id. ¶ 103.  Following alleged complaints by staff members, Griffin was issued a final writing warning on May 11, 2013 due to his alleged failure to give staff breaks and leaving dorm areas unattended by staff.  Id. ¶¶ 107, 113, 115.

On May 20, 2013 at approximately 11:30 p.m., Griffin attended a staff training conducted by LeniRae Martyn-Seidl ("Martyn-Seidl").  D. 47 ¶ 119; D. 53 ¶ 119.  Shortly after the training, Martyn-Seidl believed Griffin's behavior at the meeting suggested he was intoxicated and she began trying to contact various Shriver employees.  D. 47 ¶¶ 122-124; D. 53 ¶¶ 122-124.  In the early morning of the next day, Tamer Koheil ("Koheil"), the Shriver Director since November 2012, D. 47 ¶ 87; D. 53 ¶ 87, and Thomas Hammond ("Hammond"), another Shriver employee, headed to Carlin's Tavern at approximately 1:30 a.m., upon the belief that Griffin was there, D. 47 ¶¶ 129, 131; D. 53 ¶¶ 129, 131.  The parties contest whether Griffin was at the bar with an alcoholic drink.   D. 47 ¶ 131; D. 53 ¶ 131.  Upon confronting Griffin, Koheil and Hammond

believed that Griffin was intoxicated.   D. 47 ¶ 132.   Shortly thereafter, Shriver personnel conducted an investigation regarding the events transpiring on May 20-21, 2013.  D. 47 ¶¶ 135, 138.   On May 21, 2013, Carino submitted a recommendation to Adams Human Resources that Griffin be terminated.  D. 47 ¶ 137; D. 53 D. 47 ¶ 137.   On May 23, 2013, Koheil sent Griffin a letter indicating he was being terminated for, among other things, being under the influence of alcohol at work.  D. 47 ¶¶ 139.

## IV.   Procedural History

Griffin filed this lawsuit against Defendants in Middlesex Superior Court on April 14, 2014.  D. 11 at 27.  Defendants removed the case to federal court on June 26, 2014.  D. 1.  Prior to removal, Griffin had filed an amended complaint.   D. 11 at 10-25.   On July 3, 2014, Defendants moved to dismiss the § 1983 claims for failure to state a claim.  D. 6.  Griffin did not oppose, D. 12 at 1, and the Court dismissed those claims, D. 15.[2]  Defendants has now moved for summary judgment on the remaining counts, those arising under Chapter 151B, D. 45, and Griffin opposed, D. 52.  The Court heard Defendants on their pending motion and took these matters under advisement.  D. 56.

## V.   Discussion

### A.   Timeliness of Claims

Defendants argue that Griffin's claims for violations of Chapter 151B for discriminatory acts on or before September 22, 2012 are untimely.  D. 46 at 9-12.  Massachusetts law requires that a charge be filed with the Massachusetts Commission Against Discrimination ("MCAD")

---

[2] The Court notes that Count X against Wilson is a Chapter 151B claim for retaliation whereas Count XII is a claim brought under § 1983.  It appears Defendants intended previously to move for dismissal of Count XII and not Count X.  D. 15.  Accordingly, the Court has considered Count X, not Count XII, as part of the claims for which Defendants now seeks summary judgment.

within 300 days of the alleged discriminatory act.  See Tuli v. Brigham & Women's Hosp., 656

F.3d 33, 40 (1st Cir. 2011) (citing Mass. Gen. L. c. 151B, § 5).  As recognized by Defendants,

D. 46 at 9 n.5, Griffin's MCAD charge lists a filing date of Friday, July 19, 2013, but appears to

bear an obscured MCAD stamp indicating Monday, July 22, 2013, D. 47-7 at 108.  The parties

have not otherwise clarified this ambiguity and the Court assumes, for the purposes of this

motion only, that July 19, 2013, the earlier date that would be more favorable to Griffin, is the

operative date.  Measuring 300 days back from July 19, 2013, Griffin's claims for discriminatory

acts occurring before September 22, 2012 are untimely.  See, e.g., Shervin v. Partners Healthcare

Sys., Inc., 2 F. Supp. 3d 50, 64 (D. Mass. 2014) (recognizing that "discrete discriminatory acts

are not actionable if time barred, even when they are related to acts alleged in timely filed

charges" (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)) (internal

quotation marks omitted)), aff'd, 804 F.3d 23 (1st Cir. 2015).

Contrary to Griffin's assertion, D. 52 at 20-21, the "continuing violation doctrine" under

Chapter 151B does not save his otherwise untimely claims.  As explained by the First Circuit,

three elements must be satisfied for this doctrine to apply:

> First, the claim must be one that arises from "a series of related events that have
> to be viewed in their totality in order to assess adequately their discriminatory
> nature and impact."  Second, the claim must be "anchored" by at least one
> incident of discrimination or retaliation transpiring within the limitations period.
> This anchoring event must be "substantially relate[d]" to earlier instances of
> discrimination or retaliation and must contribute to the continuation of the pattern
> of conduct that forms the basis of the claim.  Third, the plaintiff must show that a
> reasonable person in [his] circumstances would have refrained from filing a
> complaint within the limitations period.

Shervin, 804 F.3d at 34-35 (first alteration in original) (citations omitted) (quoting Cuddyer v.

Stop & Shop Supermarket Co., 434 Mass. 521, 531, 533 (2001) and Noviello v. City of Boston,

398 F.3d 76, 86 (1st Cir. 2005)).   A plaintiff seeking to benefit from the doctrine bears the burden to establish all three elements.  Id. at 34 (citations omitted).

Griffin and Defendants focus on the third element, where the inquiry is "whether the plaintiff knew or reasonably should have known within the limitations period both that [his] work environment was discriminatory and that the problems [he] attributed to that discriminatory environment were unlikely to cease."  Id. at 35 (citing Cuddyer, 434 Mass. at 541).  Summary judgment as to this inquiry is appropriate "where a pattern of harassment, considered from the viewpoint of a reasonable person in the plaintiff's position, is so sufficiently known, pervasive, and uncorrectable that it would be unreasonable to delay filing suit."  Id. (quoting Cuddyer, 434 Mass. at 539) (internal quotation marks omitted).

Based upon the record before the Court, a reasonable factfinder could not conclude that Griffin was not put on notice of the purportedly discriminatory environment at Shriver prior to September 22, 2013, that the issues attributed to that environment would not cease and that it was unreasonable for Griffin not to file a charge at that point.

On August 27, 2012, Griffin sent a fifteen-page letter to management listing several incidents of mistreatment which he stated "surmounted to a valid gender/sexual orientation discrimination claim leaving [him] with the ability to file a claim with the Massachusetts Commissioner [sic] Against Discrimination."  D. 47 ¶ 70 (second alteration in original); D. 53 ¶ 70.  Following Adams' investigation of the issues Griffin outlined in his letter, he did not feel that the investigation was adequate.  D. 47 ¶ 78; D. 53 ¶ 78.  On September 17, 2012, Griffin met with certain Adams employees to discuss the result of the investigation.  D. 47 ¶ 79; D. 53 ¶ 79.  At the meeting, he was informed that the investigation found no evidence of discrimination.  D. 47 ¶ 80; D. 53 ¶ 80.   At his deposition, Griffin testified that, once he was notified of the

results of the investigation, he felt that this was "my kiss of death," that "[he] had exhausted [his] options" and "if anything, [ ] just really exacerbated all the issues." D. 47 ¶¶ 82-83; D. 53 ¶¶ 82-83. Furthermore, Griffin also felt that he was in an environment where he "fear[ed] for [his] safety a bit" and felt that "[t]here was nobody for [him] to lean on." D. 47 ¶ 84; D. 53 ¶ 84. Where Griffin felt that the Defendants were not going to do anything to alleviate his situation, he began searching for a new job. D. 47 ¶ 85; D. 53 ¶ 85.

There is no evidence that, following the September 17, 2012 meeting, Griffin had "good reason to believe" that the issues he encountered would cease during the limitations period. See Shervin, 804 F.3d at 35 (citation omitted). Prior to the meeting, Griffin asserted in his August 27, 2012 letter that he believed the issues he was experiencing rose to the level of gender and sexual orientation discrimination, should be reported to MCAD and, following the September 17, 2012 meeting, he felt that he had exhausted all avenues of relief with Adams. Griffin also felt that his complaints made things worse, prompting him to search for new employment. See Shervin, 804 F.3d at 36-37; see also Diagustino v. New Penn Motor Express, Inc., No. 12-cv-30159-KPN, 2014 WL 5494918, at *1-2 (D. Mass. Oct. 30, 2014) (concluding on summary judgment that a reasonable person in plaintiff's position would have filed an MCAD charge before the statute of limitations ran where her complaints were essentially ignored). For the first time, in his opposition, Griffin asserts that he "was hopeful that those incidents would be resolved," but does not otherwise cite to anything in the record in support of this contention. D. 52 at 20-21.

Accordingly, the Court concludes that the continuing violation doctrine does not save Griffin's claims for discriminatory acts occurring prior to September 22, 2012, 300 days before Griffin filed his charge with MCAD. In addressing the remaining bases of Defendants' motion

for summary judgment, the Court only considers the conduct occurring within the 300-day

period.  See Diaugustino, 2014 WL 5494918, at *2 (citing Ocean Spray Cranberries, Inc. v.

MCAD, 441 Mass. 632, 641 (2004)). [3]

### B.    Hostile Work Environment

Massachusetts law protects employees who are members of certain classes from hostile

work environments, as a form of discrimination.  Pursuant to Mass. Gen. L. c. 151B, § 4(1) &

(16A), it is unlawful:

> 1. For an employer, by himself or his agent, because of the . . . sex, gender
> identity, sexual orientation . . . of any individual to refuse to hire or employ or to
> bar or to discharge from employment such individual or to discriminate against
> such individual in compensation or in terms, conditions or privileges of
> employment, unless based upon a bona fide occupational qualification.
>
> and
>
> 16A. For an employer, personally or through its agents, to sexually harass any employee.

Under Chapter 151B, "sexual harassment" is defined as:

> sexual advances, requests for sexual favors, and other verbal or physical conduct
> of a sexual nature when . . . such advances, requests or conduct have the purpose
> or effect of unreasonably interfering with an individual's work performance by
> creating an intimidating, hostile, humiliating or sexually offensive work
> environment.  Discrimination on the basis of sex shall include, but not be limited
> to, sexual harassment.

Id. § 1(18)(b).  To bring a hostile work environment claim under Chapter 151B for harassment

based upon gender or sexual orientation, Griffin must establish that:  (1) he is a member of a

protected class; (2) he was subjected to unwelcome sexual harassment or hostility; (3) the

harassment was based upon his status in a protected class; (4) the harassment was sufficiently

---

[3] The Court notes that, although Defendants may not be found liable for conduct outside the
applicable limitations period, untimely "background evidence" can still be considered in
assessing the viability of the actionable discrimination and retaliation claims.  See Shervin, 804
F.3d at 47-48 (citations omitted).

severe or pervasive so as to alter the conditions of his employment and create an abusive work environment; (5) the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) some basis for employer liability has been established.  See Lightbody v. Wal-Mart Stores E., L.P., No. 13-cv-10984-DJC, 2014 WL 5313873, at *3 (D. Mass. Oct. 17, 2014) (quoting Ponte v. Steelcase Inc., 741 F.3d 310, 320 & n.9 (1st Cir. 2014)).

A hostile work environment is one that is "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization."  Cuddyer, 434 Mass. at 532 (quoting College-Town, Div. of Interco, Inc. v. MCAD, 400 Mass. 156, 162 (1987)) (internal quotation mark omitted).  There is no precise test, however, to determine whether a plaintiff has presented sufficient evidence that he was subjected to severe or pervasive harassment.  See Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003) (citations omitted).  A court must "examine all the attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance."  Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (citation omitted); accord Harris v. Forklift Sys. Inc., 510 U.S. 17, 23 (1993).  In doing so, the First Circuit has warned against applying these considerations and its precedent "too rigid[ly]" where "the hostility *vel non* of a workplace does not depend on any particular kind of conduct."  See Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008).  As such, evaluating a potentially hostile work environment is a fact-intensive inquiry "often reserved for a factfinder, but summary judgment is an appropriate vehicle for polic[ing] the baseline" for such claims.  See Pomales, 447 F.3d at 83 (alteration in original)

(citations and internal quotation marks omitted).  The essence of this inquiry is "to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment."  Rosemond v. Stop & Shop Supermarket Co., 456 F. Supp. 2d 204, 212 (D. Mass. 2006) (citation omitted).

The Court notes that where Griffin brings claims against Wilson, his former coworker, and Adams, his former employer, Adams can be liable for the discriminatory harassment of its employees where its "acquiescence . . . effectively communicates to the victim of harassment that [his] employer does not care about the hostile environment in which [he] must work . . . . [A]n employer who is not part of the solution inevitably becomes part of the problem."  Ryan v. Holie Donut, Inc., 82 Mass. App. Ct. 633, 638 (2012) (alteration in original) (quoting Salvi, 67 Mass. App. Ct. at 603-08 (concluding that employer's tolerance of employees' homophobic abuse of coworker creates actionable hostile work environment)).

Defendants argue that Griffin's claims fail as a matter of law because the conduct he was subjected to was not "of a sexual nature" and thus, the second and third elements of a hostile work environment claim are not satisfied.  D. 46 at 15-16.  Said differently, Defendants argue that the conduct allegedly experienced by Griffin was not because of his gender or sexual orientation.  Defendants point out that Chapter 151B is not a "clean language act" and rely upon Prader v. Leading Edge Prods., Inc., 39 Mass. App. Ct. 616, 620 (1996) to argue that the statements Wilson and other Shriver employees directed at Griffin were essentially profanity, D. 46 at 15.  In contrast to Prader, 39 Mass. App. Ct. at 619, however, where the court was addressing "garden-variety expletives" which were not "lurid innuendos," even just considering the alleged statements after September 22, 2012, in which Wilson allegedly asked Griffin upon returning from the bathroom if he had "just loosened it" and if that "how gays do it" and "heard

they gape it when you go to the bathroom" and if "in the gape scenes, is that how it all happens"

and the damage to the photograph of him and his male partner that had been displayed to his

office, D. 47 ¶¶ 91, 94 is more than garden-variety expletives or annoyances, but could suggest

discriminatory animus to a reasonable factfinder.  This is particularly when viewed against the

background of statements that pre-dated September 22, 2012 including statements about the

characterization of his attire, mannerisms and choice of fragrance as "feminine," his choice of a

bulletin board in his office as too "flamboyant" and the use of the words "fag" or faggot."  See,

e.g., D. 47 ¶¶ 32, 34, 36-37, 41, 43-45, 48, 50.  Such statements are not simply "tinged with

offensive sexual connotations," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81

(1998), but, to a reasonable factfinder, could constitute discrimination because of gender

stereotypes and Griffin's sexual orientation, id.; see Salvi, 67 Mass. App. Ct. at 603-06 (holding

as admissible evidence of a hostile work environment statements by plaintiff's coworkers that he

would become aroused if touched by employees of the same sex and homophobic slurs including

variations of "fag").  The nature of the alleged conduct as relating to Griffin's masculinity or

sexual orientation raises a triable inference that he was harassed in violation of Chapter 151B

because of gender stereotypes and his status as a gay man.

Defendants also argue, as the fourth element of a hostile work environment claim, that

Griffin's claims fail because as a matter of law because he was not subjected to sufficiently

severe or pervasive conduct.  D. 46 at 16-19.  In consideration of summary judgment, however, it

is the Court's role to distinguish, as a baseline, conduct amounting to harassment from

occasional unpleasant workplace interactions.  See, e.g., Rosemond, 456 F. Supp. 2d at 212.

Considering the record before the Court, and resolving factual disputes in Griffin's favor, a

reasonable trier of fact could find that the purported conduct Griffin experienced created a hostile

work environment.[4]  See Billings, 515 F.3d at 48 (discussing how there are no particular types of behavior necessary to constitute hostile work environment and reversing district court's entry of summary judgment in employer's favor); Lightbody, 2014 WL 5313873, at *4 (denying summary judgment in employer's favor where a reasonably jury could find that the unwanted touching of plaintiff was frequent, threatening and humiliating).  Considering that a factfinder may still be permitted to consider "untimely" evidence prior to September 22, 2012 as background evidence in assessing Griffin's timely discrimination claims, see supra note 3, a reasonable factfinder could determine that such conduct was more than mere occasional unpleasantries in the workplace.  While Defendants assert that, in response to this conduct, Griffin's performance did not suffer, D. 46 at 18, "that is not the sole indicator of whether [Griffin] was subjected to a pervasively hostile work environment," Lightbody, 2014 WL 5313873, at *4; accord Pomales, 447 F.3d at 83.  Notably, Griffin asserts that he was emotionally affected by the conduct, feared for his safety and filed complaints with Shriver and Adams to stop the conduct.  See D. 53 ¶¶ 50, 68, 84, 152.  Even then, Griffin's ability to perform at work, despite this conduct, does not doom his claims.  See Billings, 515 F.3d at 51 (citation omitted).

Accordingly, the Court denies Defendants' motion for summary judgment as to Griffin's hostile work environment claims (Counts II, III, VIII and IX).[5]

---

[4] Defendants urge the Court to rule in their favor, in large part, due to Griffin's purportedly inconsistent account of certain events in 2012 and 2013, see, e.g., D. 46 at 17-18; D. 55 at 4-7; Hrg. Tr. at 10-12, 15.  Any such inconsistencies, however, go to credibility rather than an undisputed or insufficient factual record to present to a trier of fact.  See Billings, 515 F.3d at 51-52 (vacating district court's entry of summary judgment in favor of employer where a reasonable view of the facts could differ and the facts, in their entirety, did not foreclose sexual harassment claim).

[5] The Court notes that Griffin, in all remaining Counts, alleges that Defendants failed to adequately investigate and remedy the discriminatory conduct he experienced.  See D. 11 ¶¶ 25,

### C.   <u>Retaliation</u>

Chapter 151B also protects employees from retaliation when raising concerns regarding discriminatory treatment.   The burden shifting framework applies to Griffin's Chapter 151B retaliation claims.   At the first stage, Griffin must demonstrate a *prima facie* case of retaliation by providing evidence that:  (1) he engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action.   See <u>Noviello</u>, 398 F.3d at 88; <u>see also</u> <u>Calero–Cerezo v. United States Dept. of Justice</u>, 355 F.3d 6, 25-26 (1st Cir. 2004) (noting that the burden to establish a *prima facie* case in the context of retaliation in not "an onerous one" (citation omitted)).   If Griffin satisfies his burden at stage one, the burden shifts to Defendants at the second stage to articulate legitimate, nondiscriminatory reasons for the adverse action.   <u>Bulwer v. Mount Auburn Hosp.</u>, 473 Mass. 672, 683 (2016).   Assuming Defendants satisfy their burden, the burden shifts back to Griffin, at the third and final stage, to show that Defendants' articulated reasons are pretextual.   <u>Bulwer</u>, 473 Mass. at 681 (explaining that "Massachusetts is a pretext only jurisdiction" (citations omitted)).   At the summary judgment stage for a Chapter 151B claim, a "plaintiff need only present evidence from which a reasonable jury could infer that 'the [defendant]'s facially proper reasons given for its action against him were not the real reasons for that action.'"   <u>Bulwer</u>, 473 Mass. at 682 (citation omitted).

The parties do not contest that Griffin engaged in protected activity by reporting the allegedly discriminatory conduct to Adams on, at the very least, April 9, 2012 and August 27, 2012 and that he suffered an adverse employment action by being terminated on or about May

---

29, 33, 37, 55, 59, 63, 67.  As argued by Griffin, D. 52 at 21-22, and based on the record, the Court concludes that the allegations regarding a hostile work environment raise a triable issue as to if Adams took reasonable steps to rectify acts of harassment following Griffin's complaints, <u>see, e.g.</u>, <u>Lightbody</u>, 2014 WL 5313873, at *4-5.

21, 2013.  D. 46 at 21-22; D. 52 at 23.  Defendants argue, however, that Griffin fails to make out a *prima facie* case where the period of about nine months between Griffin's August 2012 complaint and his termination severs any casual connection.  D. 46 at 21-23.  Generally, one event following another, by itself, is insufficient evidence of causality to establish a *prima facie* case, especially where the two events are separated by months.  See Dube v. Middlesex Corp., 59 Mass. App. Ct. 734, 741 n.3 (2003) (collecting cases).  A review of the case law indicates that the First Circuit has found periods of time as short as two months, Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 85 (1st Cir. 2005), and as long as eight or more months, Morón-Barradas v. Dep't of Educ. of Commonwealth of P.R., 488 F.3d 472, 481 (1st Cir. 2007), to be insufficient to establish such causality.  In response, Griffin points to his March 3, 2013 review—in which he was unjustifiably cited for dress code violations and for failing to participate in evening activities—and the resulting March 11, 2013 CAP as further evidence of disparate treatment which provides context for establishing a causal link between his earlier complaints of discrimination in August 2012 and his May 2013 termination.  D. 52 at 23-25; D. 47 ¶ 104.  Although the Court recognizes that "[c]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation,'" Ponte, 741 F.3d at 322 (second alteration in original) (citation omitted), even if the time span here does not raise an inference of retaliation, "retaliatory conduct may be demonstrated by evidence other than closeness in time." Liu v. Whitehead Inst., 2007 WL 809798, at *2 (Mass. Super. February 27, 2007) (citing Che v. Massachusetts Bay Transp. Auth'y, 342 F.3d 31, 38 (1ˢᵗ Cir. 2003).  Such is the case here where Griffin relies not just on the time between his (protected) complaints about discrimination in August 2012 and his May 2013 termination but also on the alleged discriminatory conduct he was subject to after his complaints and the allegedly unjustified

citations for poor performance in the aftermath of his complaints. Accordingly, the Court concludes that Griffin has met his *prima facie* burden.

Turning to the burden shifting framework, at stage two, Defendants primarily point to the events on the night and early morning of May 20-21, 2013—when Griffin was purportedly intoxicated at work and then left the workplace without authorization to go to a bar where he was believed to be drinking—as the legitimate, nondiscriminatory reason for his termination. D. 46 at 23-25. Defendants highlight numerous statements from witnesses of Griffin's actions that night which purportedly served as the basis of his termination. D. 47 ¶ 119. Griffin does not contest that those statements were made, D. 53 ¶ 119, but hotly contests their accuracy. See D. 52 at 25; D. 53 ¶¶ 122-124, 131-133. Thus, at the third stage, the burden shifts back to Griffin to point to evidence from which a reasonable jury could infer that this was pretext; i.e., not Defendants' real reason for his termination.

As recently discussed in the Supreme Judicial Court's decision in Bulwer, a plaintiff may point to certain categories of evidence from which a factfinder might infer that the stated reasons for termination were not the real reasons. Relevant here, one category of evidence is a defendant's failure to follow their procedures in deciding to terminate a plaintiff's employment. Bulwer, 473 Mass. at 687 (citation omitted). As recognized in Bulwer, "[a] failure to follow established procedures or criteria . . . [may] support a reasonable inference of intentional discrimination." Id. (second alteration in original) (citations and internal quotation marks omitted). The parties do not dispute that "the normal protocol for staff persons drinking is that we ask them to go to the hospital. We take them to the hospital and ask them to take a drug or alcohol test." Hammond Dep. Tr. 34:1-10, D. 53-3. Griffin, however, was never administered such a test and was refused one even at his own alleged request, D. 53 ¶ 195. Considering this

part of the record, the Court cannot conclude that no reasonable factfinder could infer Defendants' legitimate reason for Griffin's termination were false.  See <u>Bulwer</u>, 473 Mass. at 687.

While Defendants argue that those involved in the decision to terminate Griffin did not know of his prior complaints and thus their decision could not be pretextual, Carino, who had previously addressed Griffin's complaints, recommended Griffin's termination and Wilson, following Griffin's complaint in April 2012, allegedly threatened that she was "going to see that everything that needs to happen to [Griffin] happens to [him]."   D. 47 ¶ 83.   These facts, combined with Adams failing to follow the usual protocol of having a drug or alcohol test administered when it suspected Griffin of being intoxicated, are sufficient to raise a reasonable inference of pretext.

For the foregoing reasons, Defendants' motion for summary judgment on Griffin's retaliation claims (Counts I, IV, VII and X) is denied.

## VI.    Conclusion

For the reasons discussed above, the Court ALLOWS IN PART and DENIES IN PART the motion for summary judgment, D. 45.   The motion is ALLOWED as to any claims for liability regarding discriminatory acts occurring prior to September 22, 2012 and is otherwise DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge